UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT J. LEFLER,

        Plaintiff,

v.

KEN MCKEE, *et al.*,

        Defendants.

                                          /

Case No. 1:10-cv-778

Hon. Robert J. Jonker

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by prisoner incarcerated by the Michigan Department of Corrections (MDOC). This matter is now before the court on defendants' motion to for summary judgment (docket no. 11).

        **I.**        **Background**

Plaintiff has named the following defendants in his complaint: Bellamy Creek Correctional Facility (IBC) Warden Ken McKee; IBC Assistant Deputy Warden (ADW) David Johnson; IBC Chaplain Daniel Thompson; IBC Program Coordinator William Morrow; and IBC "CPC Manager" Robert Young. Plaintiff has sued all defendants in their official and personal capacities.

Plaintiff set forth the following allegations in his complaint. Plaintiff was transferred to IBC in November 2009. Compl. at ¶ 10. At that time, plaintiff requested to be placed on the call-out for the Seventh Day Adventist (SDA) worship service. *Id.* at ¶ 11. Sometime thereafter, Chaplain Thompson advised plaintiff: that there was currently not an SDA service available at the facility; that five inmates were needed to start a religious group; and that plaintiff would be required

to find four other inmates at the facility to start the group. *Id.* at ¶ 13. The allegations against Chaplain Thompson refer to the regulation of prisoner religious groups under MDOC Policy Directive 05.03.150 ¶ X (eff. Sept. 20, 2007), which requires a minimum of five inmates to constitute a group for religious services:

> Group religious services shall be offered at all CFA facilities and TRVs for prisoners belonging to a recognized religious group. Except as set forth in Attachment A [not applicable here], each group shall be allowed a weekly religious service if resources permit; however, a service is not required to be conducted at a CFA institution if there are less than five prisoners within the same security level of that institution who actively participate in the religious activities of a group.

MDOC Policy Directive 05.03.150 ¶ X. The Policy Directive further provides that "[e]ach major faith group within the same custody level of a facility may be required to hold joint services; e.g., there may be one non-sectarian service for Christian prisoners, one for Islamic prisoners, one for Jewish prisoners, and one for Native American prisoners." *Id.* at ¶ X.1.

Plaintiff responded that he had nine other inmates interested in starting an SDA service at IBC. *Id.* at ¶ 14. Chaplain Thompson was not "really happy" about initiating SDA services and doubted that plaintiff's group could "keep [the] service going" and informed plaintiff that he would remain on the Sunday generic Christian services call-out. *Id.* at ¶¶ 14-15. Plaintiff found this arrangement unacceptable because his religion requires him to worship on Saturday, not Sunday. *Id.* at ¶ 15. When plaintiff asked Chaplain Thompson to run the SDA service, Thompson declined stating that it was not his faith and it was plaintiff's job. *Id.* Chaplain Thompson subsequently refused to accommodate a list of prisoners who were interested in registering as SDA members. *Id.* at ¶ 19.

Plaintiff further alleged that Chaplain Thompson contacted an SDA church and was advised that a volunteer would be hard to come by, but that a Thursday service would be sufficient

for the SDA prisoner group. *Id.* at ¶ 25. Even though this schedule was proposed by members of an SDA church, plaintiff claims that this arrangement "violated the laws of belief of the SDA prisoners." *Id.* In addition, Chaplain Thompson stated that ADW Johnson said that no services would be allowed for SDA prisoners until the prisoners, and not the chaplain, found a volunteer for services. *Id.* at ¶ 28. Although SDA services commenced two days before plaintiff was transferred to another facility, plaintiff alleged that he was not allowed to attend. *Id.* at ¶ 30.

Plaintiff claims that defendants' actions denied his fundamental belief and "a law of God" that he and the other SDA members "must practice and rest/worship on the seventh day of the week Saturday." *Id.* at ¶ 20. Consequently, "plaintiff was forced to violate the fundamental beliefs of his religion for a period of thirty-four (34) weeks, causing him great mental distress and sleeplessness, anxiety, and fear of punishment by his religion's God." *Id.* at ¶ 31.

Based on these allegations, plaintiff claims that defendants Thompson and Johnson violated his First Amendment right to practice his religion. *Id.* at ¶ 32. Plaintiff also claims that defendants Warden McKee, Program Coordinator Morrow and CPC Manager Young violated his First and Eighth Amendment rights by denying his grievances. *Id.* at ¶ 33. In addition, plaintiff claims that all defendants committed torts against him under state law, specifically intentional infliction of emotional distress and negligent infliction of emotional distress. *Id.* at ¶ 35. Plaintiff seeks compensatory damages, punitive damages, declaratory relief and injunctive relief.

## II. Summary Judgment Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. Failure to exhaust as to defendants McKee, Johnson, Morrow and Young

#### A. Exhaustion requirement

The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' " *Jones*, 549 U.S. at 218.

#### B. MDOC grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007). A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grieveable issue, unless prevented by circumstances beyond his or her control. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. The Policy Directive provides the following directions for completing grievance forms:

> The issues shall be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

5

*Id.* at ¶ R (emphasis in original).  The prisoner must send the Step I grievance to the appropriate grievance coordinator.  If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator.  Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the appropriate MDOC official.

### C.  Plaintiff's grievances pursued through Step III

The record reflects that plaintiff appealed three grievances through Step III while incarcerated by the MDOC.  Stapleton Aff. at ¶¶ 14-17 (docket no. 12-2 at p. 4).  Two of the grievances involved medical issues unrelated to plaintiff's claims in this action.  Grievance no. IBC-09-12-4219-12d ("4219") discussed a van crash and plaintiff's claim to see a specialist for injuries.  *See* Grievance no. 4219 (docket no. 12-2 at pp. 16-20).  Grievance no. SRF-07-04-2008-12d1 (no. 2008") complained of neck and back pain from the beds at a different correctional facility.  *See* Grievance no. 2008 (docket no. 12-2 at pp. 21-27).

The only grievance filed at IBC which related to plaintiff's religious practice was grievance no. IBC-10-04-996-20b ("no. 996").  *See* Grievance no. 996 (docket no. 12-2 at pp. 12-15).  This grievance sets forth an incident date of April 3, 2010, and grieved Chaplain Thompson for failing to establish SDA services for the prisoners after plaintiff provided him with kites from nine inmates who expressed a desire to establish an SDA call-out service under Policy Directive 05.03.150.  *Id.*  As part of the Step II appeal, plaintiff expanded his claim, stating that services needed to be on Saturday, not Thursday as proposed by Chaplain Thompson (and the outside SDA volunteers who would lead the services).  *Id.*  The grievance does not name defendants McKee,

Johnson, Morrow or Young. Under these circumstances, plaintiff has failed to properly exhaust a grievance against these four defendants in accordance with the procedural rules as set forth in Policy Directive 03.02.130 ¶ R. *See Jones*, 549 U.S. at 218; *Woodford*, 548 U.S. at 90-91. Accordingly, defendants McKee, Johnson, Morrow and Young are entitled to summary judgment with respect to plaintiff's complaint.[1]

### III. Plaintiff's First Amendment claims against Chaplain Thompson

#### A. Legal Standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Plaintiff only exhausted claim is that Chaplain Thompson prevented him from practicing his religion by failing to organize an SDA religious group in a timely manner and then scheduling the group to meet on Thursdays. "The First Amendment provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise

---

[1] Furthermore, even if plaintiff had exhausted claims against these four defendants, they would be entitled to summary judgment. Plaintiff's only claims against defendants McKee, Johnson, Morrow and Young are that they denied grievances. A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "The mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). *See Martin v. Harvey*, 14 Fed. Appx. 307, 309 (6th Cir. 2001) (observing that the denial of an appeal of a grievance complaining of inadequate medical care is not the same as the actual denial of a request to receive medical care).

7

thereof." It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948). This limitation of privileges arises "both from the fact of incarceration and from valid penological objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security." *Id.* citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). Evaluation of penological objectives is committed to the considered judgment of prison administrators who are charged with and trained in the running of the particular institution under examination. *Id.* at 349. To ensure that courts afford appropriate deference to prison officials, the Supreme Court has "determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* As the court stated in *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972), "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."

      **B.**    **Plaintiff's claims**

Chaplain Thompson contends that plaintiff's allegations do not set forth a claim for relief under the First Amendment. The court agrees. Plaintiff's claims fail because inmates do not have a First Amendment right to require the establishment of group religious services within a

particular correctional facility. While prison inmates do not forfeit their constitutional right to freely exercise their religion, their exercise is subject to limitations. *See O'Lone*, 482 U.S at 348-49. One such limitation is the state's ability to regulate group religious services within its correctional facilities. *See, e.g., Colvin v. Caruso*, 605 F.3d 282, 291 (6th Cir. 2010); *Smith v. Kyler*, 295 Fed. Appx. 479, 481-82 (3rd Cir. 2008); *Spies v. Voinovich*, 173 F.3d 398, 404-05 (6th Cir. 1999). "This court has consistently permitted prisons to take into account the level of inmate interest in a particular religion when determining whether to hold services." *Colvin*, 605 F.3d at 291. *See also, Smith*, 295 Fed. Appx. at 481-82 (Rastafarian prisoner's free exercise rights were not violated by state department of corrections policy to provide chaplains for only the largest major faith groups and to prohibit group worship in the absence of an approved volunteer faith leader); *Spies*, 173 F.3d at 404-05 (holding that the MDOC's "group-of-five rule" requiring that five documented members of a faith be interested in forming a faith group before such a group can be formed, is reasonably related to legitimate penological interests and constitutionally valid under the test set forth in *Turner v. Safley*, 482 U.S. 78 (1987)).

Even though plaintiff did not have a constitutional right to the establish an SDA group religious service at IBC, the record reflects that such a group was established. In his uncontested affidavit,[2] Chaplain Thompson set forth his efforts to establish an SDA group at IBC stating: that plaintiff sent him lists of prisoners whom he claimed wanted to attend SDA services; that he explained to plaintiff that MDOC personnel "would only consider individual prisoner written requests in matters related to attending services as well as making changes in their religious preferences;" and that it was not until early April 2010 that Thompson "finally received five written

---

[2] Plaintiff did not file a counter-affidavit to dispute the facts as set forth by Chaplain Thompson.

requests from prisoners who had declared Seventh Day Adventist as their faith preference and who had also requested to attend a [sic] SDA service." Thompson Aff. at ¶ 9 (docket no. 13-3).

Chaplain Thompson also related his efforts to obtain SDA volunteers to lead prison worship services, stating in part as follows:

> Mike Fracker served as my point of contact with the Ionia SDA church. He indicated to me that Saturday would not be a good day for them to support an SDA program and stated that they prefer a different day. We agreed that the SDA meeting would be scheduled on Thursday evenings and meet weekly from 1930-2030 hours. He then proceeded to garner the interest of several individuals who would be interested in leading SDA services in a prison setting. The ADW of Programs advised me to try and coordinate beginning SDA services for the level two prisoners at IBC using volunteer leadership. Several weeks passed as Mr. Fracker enlisted the help of his faith community. In early June, I grew concerned about how long this process was taking and Mr. Fracker explained that the summer church calendar was so full, that they would not be able to lend volunteer support until sometime in July. I advised ADW of Programs Dave Johnson of this development and he authorized the SDA service to begin on June 17, 2010, using prisoner leadership. Prisoner Lefler attended one meeting and then transferred to another facility.

Thompson Aff. at ¶ 9. Finally, Chaplain Thompson observed that religious services at IBC are not necessarily scheduled on the religious group's "holy day," noting IBC has two Nation of Islam groups and one Christian group whose worship service is not scheduled on what is considered their "holy day" for worship. Thompson Aff. at ¶ 9. While plaintiff protests the fact that SDA services occurred on Thursday, those services were proposed by members of his own faith who volunteered to lead the services in the prison. There is no evidence that Chaplain Thompson, or any other MDOC employee, scheduled SDA services to interfere with plaintiff's religious observance.

Furthermore, nothing in the record indicates that plaintiff was prevented from exercising his religious beliefs while at IBC. Indeed, plaintiff does not allege that any MDOC officials prevented him from practicing his religion as an individual while housed at IBC. *See, e.g., Colvin*, 605 F.3d at 291-92 (noting that prisoner had no restrictions on practicing Judaism privately,

reading Jewish literature, or corresponding with other prisoners of his faith); *Spies*, 173 F.3d at 404-05 (noting that prisoner was not prevented from practicing his religion when he was allowed to meditate privately, correspond with fellow believers, and consult with a personal minister). Accordingly, Chaplain Thompson is entitled to summary judgment.

### IV.   State law claims

Plaintiff's remaining claims allege the intentional infliction of emotional distress and negligent infliction of emotional distress under Michigan state law. Section 1367 of Title 28 of the United States Code provides that "the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form a part of the same case or controversy." 28 U.S.C. § 1367(a). The court exercised its supplemental jurisdiction over plaintiff's state law claims, because those claims were intimately related to the alleged § 1983 violation. The dismissal of plaintiff's federal claims against defendants, however, requires the court to re-examine the issue of supplemental jurisdiction for state law claims against this defendant. Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction." Thus, once a court has dismissed a plaintiff's federal claim, the court must determine whether to exercise, or not to exercise, its supplemental jurisdiction under § 1367. *See Campanella v. Commerce Exchange Bank*, 137 F.3d 885, 892-893 (6th Cir. 1998).

As a general rule "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996). Here, the Court has rejected

plaintiff's federal claims. There is no reason to retain supplemental jurisdiction over plaintiff's state law claims, and the court should dismiss all of the state law claims asserted against defendants.

### V. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 11) be **GRANTED** as to plaintiff's federal claims brought pursuant to 42 U.S.C. § 1983.

I further recommend that plaintiff's state law claims be **DISMISSED** and that this action be terminated.


Dated: August 10, 2011                                 /s/ Hugh W. Brenneman, Jr.
                                                       HUGH W. BRENNEMAN, JR.
                                                       United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).